# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

June 11, 2025

**BY ECF**

Hon. John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

RE:     **United States v. Ronnell Gurley**
        **25 Cr. 44 (JGK)**

Dear Judge Koeltl:

The only scars on Ronnell Gurley's body live on his left shoulder and under his arm—a permanent symbol of the summer day in 2010 when he was shot by a boy in his neighborhood. Ronnell was just nine years old. He was scarred for life, emotionally and physically.

It would be simple to conclude that Mr. Gurley, a victim of gun violence a block away from the housing projects where he was raised, would never commit an offense that puts other lives at risk. But life is not simple. People are complex. Immersed from birth in a culture of poverty and guns, where drugs are common and violence is normalized, where your role models and neighbors are not doctors and lawyers but drug sellers and gang members, it is difficult to forge a different path. For Mr. Gurley, it has been nearly impossible.

Ronnell Gurley committed a tremendous and potentially dangerous error when he sold guns and cocaine to a confidential informant. "It was wrong," he admits, "but I never learned another way." Letter of Ronnell Gurley, Ex. A. He details:

> I have at least seven close family members who have been incarcerated. In fact, where I come from, the two most common life outcomes are jail or death…. Feeling stuck in this cycle has played with my mind a lot. I've always wanted more for myself, but I didn't know how to go about achieving that.

*Id.*

Mr. Gurley's mother observes, "There were moments when the weight of everything he'd been through showed up in his actions in his anger, in his silence, in decisions made out of survival rather than peace." Letter of Anna Gurley, Ex. B.

Acknowledging his wrongs, Mr. Gurley accepted responsibility swiftly, admitting to his misconduct only two months after his arrest. The consequences of Mr. Gurley's actions are severe: He will spend the next five years, at minimum, incarcerated in a federal correctional facility. He has never before served more than eight months in jail. He knows he was wrong and he will never again repeat the same mistake. "I've realized what really matters in life is my health and being present with my family," Mr. Gurley reflects. *Id.*

To achieve the aims of sentencing, including punishment and deterrence, we respectfully request that Your Honor sentence Mr. Gurley to 60 months' incarceration. This sentence, which is within Mr. Gurley's Guideline range and recommended by Probation, is a substantial one that reflects the seriousness of the offense and is sufficient, but not greater than necessary. *See* 18 U.S.C. § 3553(a).

## I.    Background

### A.    *Ronnell Gurley's childhood and adolescence*

Ronnell Gurley was born when his mother was just six months pregnant, her umbilical cord wrapped around his neck. Ronnell stayed in the Neonatal Intensive Care Unit for two weeks following his birth. This was not the only time he was admitted to the hospital as a young child.

In Ronnell's childhood neighborhood, violence was normal. Drug use proliferated. Gangs dominated. "In the neighborhoods we were forced to raise our children in, violence wasn't a distant threat. It was always near," Ronnell's mother makes plain. Letter of Anna Gurley, Ex. B. But living in a safe neighborhood was not an option given the family's limited resources. "[W]e had no choice but to raise our children in the ghetto," Ronnell's father confirms. Letter of Anderson Greenidge, Ex. C. Ronnell and his baby sister grew up with very little. While his parents did what they could to meet their basic needs, Ronnell did not have much compared to other kids. "We knew what it meant to go without," his sister shares. Letter of Alaness Greenidge, Ex. D. But Ronnell "never let the weight of our circumstances break his spirit." *Id.*

Ronnell did his best to resist the social pressures of his environment. "I never joined a gang, despite people trying to recruit me, and it completely socially isolated me." Letter of Ronnell Gurley, Ex. A. His mother expounds, "For boys like my son, growing up in the poorest of the poor neighborhoods, it often came down to two choices: be shot, or do the shooting." Letter of Anna Gurley, Ex. B. "But he wasn't out causing trouble." *Id.*

When Ronnell was nine years old, he was shot. He and his cousins had taken their uncle's bike to a convenience store a block away from his grandmother's apartment. While they were inside, a group of boys stole the bike. When Ronnell's uncle asked them to return the bike, one of the boys fired shots. "One bullet grazed Ronnell, and the other burrowed into his left shoulder." Isolde Raftery, 'Mommy,' Boy Said, 'I Got Shot,' N.Y. Times (Jun. 25, 2010), Ex. E. Ronnell was admitted to the pediatric intensive care unit at Brookdale Hospital and remained hospitalized for nearly two weeks. "The bullet tore through his arm and lodged so close to critical nerves that surgery was deemed too risky. It's still there buried in his body, a permanent reminder of a world that never felt safe." Letter of Anna Gurley, Ex. B.



"That injury didn't just change his body, it marked his childhood," Ronnell's mother reflects. *Id.* After the shooting, Ronnell's mother "worried that the neighborhood might be too dangerous to allow Ronnell and her other child, a 2-year old daughter, Alaness, to roam so freely." Isolde Raftery, 'Mommy,' Boy Said, 'I Got Shot,' N.Y. Times (Jun. 25, 2010), Ex. E. "It changed how he walked through the world," Ms. Gurley reveals. Letter of Anna Gurley, Ex. B. Ronnell confirms, "Since that day, I've suffered from PTSD and I'm always on the defensive." Letter of Ronnell Gurley, Ex. A.

Ronnell could not escape his neighborhood. "He was exposed to poverty, crime, and loss from a young age." Letter of Dana Griffin, Ex. F. The following year, when Ronnell was 10 years old, the police executed a search warrant at his parents' home. They recovered drugs. Ronnell's parents were arrested for selling narcotics out of their home. 2011 Investigation Progress Notes, Ex. G. At the time, Ronnell had been living with his grandmother in public housing, where he shared a twin bed with his sister in his grandmother's bedroom. *Id.* The Administration for Children's Services (ACS) filed a neglect petition against Ronnell's parents in family court. Ronnell remained with his grandmother in kinship foster care while the family court case against his parents proceeded. *Id.* He ended up staying with his grandmother for several years before returning to live in his parents' home. *See generally* Presentence Report ¶ 69.

As a child, Ronnell struggled in school. He had to repeat second grade and his third grade teacher referred him for counseling. 2009 Investigation Progress Notes, Ex. H. She reasoned, "Ronnell must be observing something within the home because on a normal day he is the most sweet child but if it's a bad day it's like the world has come to an end." *Id.* Ronnell's educators also recommended he be evaluated for an Individualized Education Plan (IEP). DOE Records, Ex. I. But his mother would not consent. *Id.*

In middle school, Ronnell was referred to Man Up!, an organization that provides violence prevention and intervention services to empower the community. *See* Jim Dwyer, No Shootings or Killings for 363 Days, but the Fight Is Far From Over, N.Y. Times (Jul. 18, 2013). Man Up! relies on trained "credible messengers"—community members who have lived through and understand community violence—to intervene and mediate disputes. Ronnell volunteered to give out food from their food pantry and participated in the organization's after-school program as a "Junior Violence Interrupter (JVI)." Letter of James Peterson, Ex. J. *See also* Letter of Dana Griffin, Ex. F. "This was a very important role," notes Man Up! Executive Director James Peterson. Letter of James Peterson, Ex. J. "The JVI helped intervene with High-Risk individuals helping to resolve conflicts without the use of weapons." *Id.*

When Ronnell was in high school, his mother requested an evaluation to determine his eligibility for special education services. DOE Records, Ex. I. Ms. Gurley noted her son's struggles

3

to learn and his tendency to isolate himself; she wanted to know if he had a learning disability. *Id.* The evaluator determined that Ronnell would benefit from counseling and agreed that they should assess whether he had a learning or emotional disability. "There were moments when the weight of everything he'd been through showed up in his actions in his anger, in his silence, in decisions made out of survival rather than peace." Letter of Anna Gurley, Ex. B.

Given Ronnell's trauma history, the evaluator provided his mother with "information on trauma and [its] impact on learning." DOE Records, Ex. I. The evaluator determined that "Ronnell presents with avoidant tendencies that make it difficult for him to form trusting relationships with family and others." *Id.* This manifested in school, "negativ[ely] impacting his ability to learn." *Id.* The Committee on Special Education identified Ronnell as having a learning disability. *Id.* He was recommended to receive integrated co-teaching (ICT) services. But he continued to struggle in school. He was over-age and under-credited. School proved challenging.

Ronnell was failing in school. And he had little at home beyond what was necessary to meet his basic needs and few role models to rely on. But he had an entrepreneurial spirit. Ronnell remembers reselling cookies he purchased at the wholesale retailer BJ's when he was just 11 years old. Oreos were his favorite. He would purchase a box of 36 or 46 cookies and resell them at school for one dollar apiece. When he was older, Ronnell dreamed of starting a business and owning a home. "He used to pull up house postings on Zillow and we'd talk about how he can work towards buying it, and possibly even co-owning an investment property together," his former teacher recalls. Letter of Dana Griffin, Ex. F. "He also discussed plans to open a center for young folks to work on their resumes, organize community events, host job fairs etc." *Id.* But nothing materialized. *See generally* Presentence Report ¶¶ 82–83.

As a teenager, Ronnell spent a summer picking up trash for Summer Youth, and when he was older, he worked in construction to help support his family. "All his paychecks went towards helping us," his sister reports, "and he bought both my graduation dress and cap and gown from the money he got working in construction." Letter of Alaness Greenidge, Ex. D. But it was never enough.

"As I got older, I began recognizing the level of ignorance in my community," Ronnell laments. No one knew how to build credit or invest savings. When Ronnell asked his elders for advice about the home buying process, he quickly learned that no one owned their home. He thought: What did you accomplish? Why did you get nothing done? "I wanted something more but I didn't know how to achieve it," Ronnell concedes. Letter of Ronnell Gurley, Ex. A.

With no safety net and little guidance, Ronnell "began taking shortcuts to earn money and fell into trouble." Letter of Anderson Greenidge, Ex. C. Everyone in his neighborhood—including his own parents, it appeared—had at some point made money selling drugs. *See* 2011 Investigation Progress Notes, Ex. G. Ronnell fell into the same trap. "It's the only way I knew how to make money to support my family and dig my way out of poverty," Ronnell admits. Letter of Ronnell Gurley, Ex. A. "It was wrong, but I never learned another way." *Id.*

Twice while Ronnell was living with his father, police kicked down his dad's door. Law enforcement recovered crack cocaine on a hallway table and a gun under the sink. Ronnell was 18

years old. He was arrested and charged in state court. Two years later, Ronnell was rearrested following a search of the same apartment, his childhood home, where police recovered crack cocaine and paraphernalia consistent with drug sales. In 2022, when he was just 21 years old, Ronnell was sentenced to 364 days' incarceration for both offenses.

For Ronnell, this outcome felt inevitable. "I have at least seven close family members who have been incarcerated," he reports. *Id.* One of his closest friends died in prison two years ago. Another friend, who had in the past lived with Mr. Gurley, died in prison last year. About three years ago, another friend was murdered in the street. Mr. Gurley saw his lifeless body after his death. "In fact, where I come from, the two most common life outcomes are jail or death." *Id.*

**B.** **The offense conduct**

Having been raised in Brownsville and shot as a child, when he grew older, Ronnell felt the urge to carry a weapon for protection. He became fascinated with guns, amassing a personal collection and familiarizing himself with different types of firearms. He liked the way they looked and the way they sounded. But he never personally engaged in acts of violence. Ronnell never threatened anyone with a weapon. He never brandished a firearm. He never fired a shot at anyone. Everyone in the neighborhood seemed to have access to a firearm. Having his own weapon made Ronnell feel safe and protected.

Few knew of Mr. Gurley's love of guns. But among those who knew was the confidential informant, the brother of one of Mr. Gurley's closest friends. The confidential informant also knew that Mr. Gurley had been released from jail earlier that year and had no money. The informant approached Mr. Gurley about selling guns and drugs. Mr. Gurley had never before sold a gun to anyone. But he trusted the informant and felt it was his duty to provide for his mother and sister. This seemed like the easiest option.

"In recent years, I became more stressed feeling like the clock was working against me in my journey towards finding a way out," Mr. Gurley says. Letter of Ronnell Gurley, Ex. A. "I started feeling defeated, and it seemed that the only way for me to better my situation was to engage in illegal activities." *Id.*

"Growing up in poverty shaped my brother in ways that words can barely capture," Ronnell's sister expounds. Letter of Alaness Greenidge, Ex. D. "From a young age, he carried burdens most kids shouldn't have to, worrying about bills, making sure I ate before he did, and constantly finding ways to make do with what little we had." *Id.*

For two months in 2023, August and September, Mr. Gurley sold weapons and cocaine to the confidential informant. Then, he stopped. For more than a year, Mr. Gurley did not sell the informant any guns or drugs. But in a year later, he fell back into bad habits. "Feeling stuck in this cycle has played with my mind a lot," Mr. Gurley shares. *Id.* "I've always wanted more for myself, but I didn't know how to go about achieving that." *Id.*

In September 2024, Mr. Gurley engaged in one transaction with the informant, followed by another on December 4, 2024. He was arrested the following day. Over the course of his misconduct, Mr. Gurley never sold to anyone other than the confidential informant.

On December 5, 2024, Mr. Gurley was presented in Magistrate Court on a criminal complaint alleging conspiracy to distribute narcotics and firearms offenses. With the government's consent, Mr. Gurley was released with conditions, including home incarceration enforced by electronic monitoring.

Just two months later, on February 5, 2025, Mr. Gurley accepted responsibility for his actions. He waived his right to indictment and pled guilty, pursuant to a plea agreement, to an information charging one count of 21 U.S.C. § 841(b)(1)(B), conspiracy to distribute and possess a cocaine, and one count of 18 U.S.C. § 922(g)(1), unlawful possession of firearms. Mr. Gurley has remained in the community on home incarceration since his arrest and has remained compliant with his conditions of release. Presentence Report ¶ 8.

Mr. Gurley is scheduled to appear for sentencing on June 25 at 12:00 pm.

## II.    Sixty months of incarceration is the most appropriate sentence for Ronnell Gurley.

The parties agree on Mr. Gurley's advisory sentencing range under the Guidelines. Pursuant to the terms of the plea agreement, the parties stipulated that Mr. Gurley was in Criminal History Category III and his total offense level was 23. Under the currently applicable Sentencing Guidelines, the Stipulated Guidelines Range is 57 to 71 months' incarceration, with a mandatory minimum term of 60 months' imprisonment. Probation agrees with the parties' analysis.

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). In exercising this discretion, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)," which requires the Court to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)": "proportionality, deterrence, incapacitation, and rehabilitation." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (quoting *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010)). In determining the appropriate sentence, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (citations omitted).

In accordance with these principles, the Court should sentence Mr. Gurley to 60 months' incarceration.

### A.    *Ronnell Gurley's community ties are a reason to impose a sentence of 60 months' incarceration.*

Mr. Gurley's offense conduct does not reflect his character. By all accounts, Ronnell Gurley is a family oriented individual who would do anything for those he loves. He has lived his entire life between Brownsville and Canarsie in Brooklyn, surrounded by his close knit family, and continues to enjoy their support.

As evinced by his letters of support, Mr. Gurley is thoughtful and generous in spirit. Examples abound. His girlfriend details, "I met Ronnell three months after my mom passed away,

and on her birthday he took my brothers and I to put flowers on her grave. He listens with his whole heart, encourages my growth, and never lets a day go by without reminding me how much I mean to him." Letter of Savanna Graham, Ex. K.

Mr. Gurley's aunt, Vanessa Gurley, praises her nephew's efforts to support her husband after they learned he was at risk of heart failure. "Ronnell looked up everything he could online to help him with his illness. He would go and buy cold pressed, fresh juices with ingredients specifically for the illness that my husband was suffering from." Letter of Vanessa Gurley, Ex. L.

His aunt also reflects on the relationship between Ronnell, his sister, and their mother. "Ronnell has supported them both tirelessly and selflessly. They have struggled emotionally a lot since his arrest. His mother calls me often and cries thinking about what's going to happen to him in prison." *Id.*

Mr. Gurley looks forward to reuniting with his family after serving his sentence. "After a while, if I have the funds and resources, I'd love to start a food truck business with my dad." Letter of Ronnell Gurley, Ex. A. His father is also looking forward to beginning a new business venture with his son in a new chapter of his life. *See* Letter of Anderson Greenidge, Ex. C.

### B.    *A sentence of 60 months' incarceration would not create unwarranted sentence disparities.*

A sentence of 60 months' incarceration would be consistent with the sentences imposed on defendants convicted of similar offenses and would therefore not create "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Individuals in this District facing a mandatory minimum sentence of 60 months' incarceration for conduct similar to Mr. Gurley's—and in some cases, more egregious—are routinely sentenced to 60 months. This includes cases involving shootings, with defendants with lengthy records of criminal and often violent conduct:

*United States v. Murray*, 20 Cr. 667 (VEC): plea to one count of 18 U.S.C. § 924(c)(1)(A)(i) where defendant with eight prior convictions who distributed significant amounts of crack cocaine was sentenced to 5 years' incarceration

*United States v. Luis Garcia*, 20 Cr. 667 (VEC): plea to one count of 18 U.S.C. § 924(c)(1)(A)(i) where defendant with a criminal history and a pending assault charge who was a member of a drug trafficking organization, was observed distributing crack cocaine approximately 10 to 15 times and possessed a semi-automatic handgun was sentenced to 5 years' incarceration

*United States v. Ricardo Garcia*, 20 Cr. 667 (VEC): plea to one count of 18 U.S.C. § 924(c)(1)(A)(i) where defendant with a criminal history, who was a member of a drug trafficking organization, distributed crack cocaine and possessed a semi-automatic handgun was sentenced to 5 years' incarceration

In cases where individuals with a criminal history comparable to Mr. Gurley were sentenced for similar conduct but not subject to a mandatory minimum sentence, the sentences imposed were well below 60 months' incarceration.

*United States v. Sims*, 24 Cr. 253 (KMK): plea to one count of 21 U.S.C. § 841(b)(1)(C) and one count of 18 U.S.C. § 922(g) where defendant with prior felony convictions for robbery and criminal sale of a controlled substance who sold firearms, cocaine and fentanyl over a period of several months was sentenced to time served (14 months' incarceration)

*United States v. Porter*, 23 Cr. 458 (LGS): plea to one count of 21 U.S.C. § 841(b)(1)(C) where defendant with prior youthful offender adjudication for robbery who brandished a gun at an individual and sold more than 840 grams of crack cocaine over two years was sentenced to 18 months' incarceration

*United States v. Blyden*, 22 Cr. 265 (ER): plea to one count of 21 U.S.C. § 841(b)(1)(C) with agreement not to contest that defendant engaged in a shooting where defendant sold multiple firearms and ammunition in connection with his drug trafficking activity was sentenced to 24 months' incarceration

*United States v. Wilbright*, 20 Cr. 667 (VEC): plea to one count of 21 U.S.C. § 841(b)(1)(C) where defendant in Criminal History Category III with prior gun and narcotics convictions was a member of a drug trafficking organization who possessed a gun and personally sold 840 grams of crack cocaine was sentenced to 24 months' incarceration

*United States v. Zayas*, 22 Cr. 178 (NSR): plea to one count of 21 U.S.C. § 841(b)(1)(C) where defendant who recently served 48 months' incarceration for narcotics trafficking possessed two semiautomatic firearms along with 84 grams of crack, 49 grams of cocaine, a digital scale with white powder, drug packaging material, and nearly $19,000 cash was sentenced to 48 months' incarceration

*United States v. Edwards*, 20 Cr. 618 (VB): plea to one count of 21 U.S.C. § 841(b)(1)(C) and one count of 18 U.S.C. § 922(g)(8) where defendant in Criminal History Category IV who was found with a loaded firearm and heroin, crack cocaine, hundreds of glassine envelopes, a scale and coffee filters with crack cocaine next to what appeared to be recently cooked crack cocaine was sentenced to 18 months' incarceration

Accordingly, a sentence greater than 60 months' incarceration is unwarranted and unnecessary under 18 U.S.C. § 3553(a).

### C.    *Ronnell Gurley has a distinct capacity for rehabilitation.*

Ronnell was just 23 years old when he possessed firearms and agreed with others to sell cocaine, and only 18 and 20 years old at the time of his prior offenses. He was wrong. But the law—and the advisory Guidelines—recognize young adults' unique capacity for change. In *Miller v. Alabama*, the Supreme Court insisted that "a sentencer have the ability to consider the 'mitigating qualities of youth.'" 567 U.S. 460, 476 (2012) (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)).

> As we observed, "youth is more than a chronological fact." It is a time of immaturity, irresponsibility, "impetuousness[,] and recklessness." It is a moment and "condition of life when a person may be most susceptible to influence and to psychological damage." And its "signature qualities" are all "transient."

*Id.* at 367, 472 n.5 (internal citations omitted) ("It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance.").

While Supreme Court jurisprudence on youth offenders captures individuals under 18 years old, adolescent brains continue to develop through a person's mid-20s. "The frontal lobes, homes to key components of the neural circuitry underlying "executive functions" such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life." Johnson, *et al.*, *Adolescent Maturity and the Brain*, J. Adolescent Health 2009.

The Sentencing Guidelines reflect this social science data. The Guidelines advise that a downward departure may be warranted based on an individual's age "at the time of the offense or prior offenses." U.S.S.G. §5H.1.1 (Nov. 1, 2024). This departure may easily take the form of a variance. The Guidelines further recognize that "youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation." *Id.*

The relevant Guideline identifies "risk factors" that "may affect a youthful individual's development into the mid-20's and contribute to involvement in the criminal justice systems." *Id.* Mr. Gurley has encountered each of these risk factors. He was raised in an unforgiving and dangerous environment—public housing in Canarsie and Brownsville—where he was shot and hospitalized when he was just nine years old. Just a year later, his parents were arrested for selling drugs out of their home and he was placed in kinship foster care with his grandmother, where he remained for the next eight years.

The Guideline further recognizes that, as Mr. Gurley's behavior reflects, "youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood." *Id.*

For these reasons, the Court should recognize Ronnell's youth at the time of the offense as a mitigating factor at sentencing. His behavioral patterns do not reflect simple choices made by a young person; they are a matter of neuroscience: the prefrontal cortex area that affects the ability to make complex decisions and properly weigh risks and rewards is the last to mature.

### D.    *A sentence of 60 months' incarceration is "sufficient, but not greater than necessary" to achieve a deterrent effect.*

Ronnell Gurley committed a serious offense that warrants a sentence sufficient to deter him from ever again engaging in such conduct. Sixty months of incarceration is that sentence.

### 1.    Specific Deterrence

Eight months in city jail when he was 21 years old did not deter Ronnell Gurley from reoffending. Sixty months—five years—of incarceration in a federal correctional facility will.

Over the past six months on home incarceration—during which time Mr. Gurley could not leave his home for any reason except to attend court, meet with counsel, or for medical care—he has done little but self-reflect. "Seeing my family struggle because I'm unable to contribute financially is very hard," Mr. Gurley admits. Letter of Ronnell Gurley, Ex. A. Mr. Gurley knows that when he is eventually released, he must find lawful employment. He understands that illegal activity, even if lucrative, is not a viable source of income—he will be a better provider for his family earning minimum wage in the community than earning no wage in prison. "I've watched them work nonstop to be able to provide for all of us and take care of me, and it's not easy at all. It pains me that I've put them in this position and can't pull my weight." *Id.* When he is released, Mr. Gurley's "number one priority is getting a job." *Id.*

"I've seen the weight of guilt Ronnell carries every single day when it comes to his case," his girlfriend shares. Letter of Savanna Graham, Ex. K. "It's not just about what happened, it's about how deeply he regrets the impact it's had on everyone he loves." *Id.* Mr. Gurley recognizes that because of his misconduct, he will miss significant family events, beginning with his sister's high school graduation. "[He] even cried the other day thinking about it," Ronnell's father reveals. Letter of Anderson Greenidge, Ex. C. "He loves his sister so much and wants to be there for whatever she needs." *Id.*

In addition to the emotional weight of the pending sentence, which is sufficient on its own to deter Mr. Gurley from reoffending, Mr. Gurley has suffered physically as a result of his criminal case. *See* Letter of Anna Gurley, Ex. B. On March 3, 2025, Mr. Gurley was hospitalized after experiencing numbness in his eyes and mouth. He was diagnosed with Bell's Palsy. The medical condition continues to affect him today: "I've been having issues in my arms and legs, can't move my neck at times, and my face is misconfigured and drooping on one side. My face hurts and it makes it difficult to speak," he relays. Letter of Ronnell Gurley, Ex. A. This experience has taught Mr. Gurley "that what really matters in life is my health and being present with my family." *Id.*

A sentence greater than 60 months is unnecessary to deter Mr. Gurley from committing another offense.

### 2.    General Deterrence

Nor is an extensive term of incarceration necessary to achieve the sentencing aim of general deterrence. As the Honorable John Gleeson has recognized, general deterrence is "a phenomenon that is notoriously difficult (and perhaps impossible) to measure." *United States v. Brady*, No. 02 CR 1043(JG), 2004 WL 86414, at *9 (E.D.N.Y. Jan. 20, 2004). Indeed, "determinations regarding general deterrence may be highly subjective, and we must be careful that the individual defendant is not lost in a stereotype." *United States v. Cavera*, 550 F.3d 180, 223 (2d Cir. 2008) (Sotomayor, J., concurring in part).

10

"To the extent that consequences for the same federal offense vary widely from one judge to the next, deterrence is undermined because 'a defendant who comes up for sentencing has no way of knowing or reliably predicting whether he will walk out of the courtroom on probation, or be locked up for a term of years that may consume the rest of his life, or something in between.'" *Id.* (quoting Marvin E. Frankel, *Criminal Sentences: Law Without Order* 6 (1973)). Indeed, this is the cornerstone of federal practice. It is precisely why individuals are cautioned before each plea that no one can reliably predict what their sentence will ultimately be. This is, in fact, a logical consequence of a federal system that demands judges sentence defendants as individuals, based in part on "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

Ronnell Gurley has worked hard to meet the expectations set by the Court's conditions of release. He has spent the vast majority of the past year inside his home, reflecting on his misconduct. To the extent that this Court is concerned with sending a message to the community, five years of prison satisfies this aim.

## III.     Conclusion

Thank you for your consideration of Mr. Gurley's request for a sentence of 60 months of incarceration.

Respectfully submitted,

*/s/*

Marne L. Lenox

*Counsel for Ronnell Gurley*

cc:      Marguerite Colson, Assistant U.S. Attorney

11